### SMITH v. MAYFIELD HEIGHTS (City) et.

Common Pleas Court, Cuyahoga County.

No. 633026.   Decided April 28, 1952.

484

George J. McMonagle, Cleveland, for plaintiff.
Squire, Sanders & Dempsey, Cleveland, for defendants.

## OPINION

By CONNELL, J.

This cause came on for hearing on the pleadings and the evidence, all parties requesting declaratory judgment of the court in their favor. Substantially, plaintiff asks that he be declared the police chief of the City of Mayfield Heights, Ohio, by reason of the fact that he had been police chief of the Village of Mayfield Heights, Ohio, before its status was changed to that of city on October 5, 1951; substantially, defendants claim that the change of status of such village to that of city created a vacancy in such office.

The petition of the plaintiff alleges that the City of Mayfield Heights came into existence as a city on October 5, 1951, it having been previously a village, and that defendant, Henry Ritter, Jr., became mayor of such city on January 1, 1952. Plaintiff claims that he had been chief of police of the Village of Mayfield Heights from April 23, 1947 and had been a member of its police department for approximately fifteen years in all.

Plaintiff claims that the City of Mayfield Heights adopted a city charter as of January 1, 1952, Article III, Section 3 (D) of which gives such mayor power to appoint or remove any official or employee of such city, with the exception of elective officers, subject to the charter itself and the laws of Ohio.

Plaintiff says that Article V, Section 7 of such charter contains a provision pertinent to the Civil Service Commission of the city and its powers which section contains a clause to the effect that "Any person who shall have served the city for at least one year next preceding the taking effect of this charter may be retained in the same or any similar position without examination."

Plaintiff claims that he has a vested right in his office as chief of police of the City of Mayfield Heights by reason of the application of §§4384, 486-1 to 486-31 inclusive, and 486-179 GC.

Plaintiff further claims that as a member of the police department of the Village of Mayfield Heights since his original appointment on April 7, 1937 that he has acquired rights in a Police Relief and Pension Fund based on his approximate fifteen years of service and his contributions thereto.

Plaintiff says that defendant Mayor Henry Ritter, Jr. threatens to discharge him and deprive him of all of his rights and plaintiff asks a judgment declaratory of his rights under §§12102-1 and 12102-6 GC, inclusive.

Plaintiff prays that in the declaratory judgment which he asks that this court determine whether such mayor has power to remove him under Article III, Section (D) of such charter; whether plaintiff retains his rights as chief under such charter; whether §§4384, 4263-4267, 486-17 A GC apply, and whether charges could be made against plaintiff for acts occurring before January 1, 1952.

A temporary restraining order having been issued against defendants by this court, all parties are still in status quo.

Defendants' answer admits that had this court not issued its restraining order a successor to plaintiff as police chief would already have been appointed. Defendants say that the office plaintiff held before December 31, 1951 expired as of

that date and that the office of chief of police of the City of Mayfield Heights is now vacant. Defendants deny plaintiff's right to such office.

Defendants admit that Mayor Ritter, Jr., before taking office had stated that he didn't believe that plaintiff "ought to be Chief of Police and that upon becoming Mayor he would bring about his removal."

Defendants ask the court to declare that the office previously occupied by plaintiff as Chief of Police of the Village of Mayfield Heights automatically expired on December 31, 1951 and that plaintiff does not now hold such office.

Counsel on both sides have kindly furnished the court with voluminous briefs citing all Ohio cases considered by such eminent counsel to be here involved. There will be no need for the repetition of such citations herein.

It is here the primary function of the court to determine whether or not plaintiff is entitled to a declaratory judgment in his favor by reason of the factual history involved concerning which there is no disagreement.

That factual history includes the proposition that defendant Mayor Ritter, Jr., personally threatened to accomplish the removal of this chief of police as soon as he thought he had power to do so. Such mayor rather boldly admits in his answer that such was his intention and that only for this court's injunction his intention would have been effectuated 'ere now; he here asks such judgment as would make the court an instrumentality for fulfilling his threat. The court is a little fearful that personal motives and animosities have entered into the controversy and that defendant who styles himself "a strong mayor" is in a position like Herod, who, having promised a head, will be embarrassed if he can't deliver. Indeed, politics some times creates strange situations for the law because executives oft-times make decisions as a matter of what is expedient to them politically and then expect lawyers and courts to justify their actions.

And since the primary question determinative of the case is one of construction and legislative intent, we must ascertain what the legislature had in mind when it enacted §4384 GC effective September 5, 1941.

We must assume that our legislators are intelligent, capable, and honorable law makers, cognizant of the history which in each instance leads to the desirability of making or changing laws. Generally, they are men whose vocations are law, business, or farming, and whose avocations become that of lawmaking through selection and election of the people. Generally, they are men of practical experience, judgment,

and common sense. With some specialized legislation they may not be universally familiar, but with fire and police legislation they are quite universally familiar because within the last two decades they have so successfully solved fire and police problems that litigation on the subject has almost ceased.

The work of firemen and policemen is in a class entirely by itself. While the purpose of government is to secure our rights, there are nevertheless very few functions which the government performs for the people which the people could not have performed for themselves. The exceptions are the work of the fire, police and health departments, each of which requires the ability to cope with emergencies not susceptible of control except on the part of brave men who have had years of practical experience in eating smoke or dodging bullets or controlling epidemics, all of which is well known to our legislators, and which has been the reason for the withdrawal of city control over these three functions on the part of the state for the benefit of the people. Gradually it has been recognized throughout Ohio that this is a problem of statewide concern requiring state sovereignty and control to insure uniformity, co-operation, and state-wide protection. Repeated wars and their constant suggestion of catastrophic dangers impels it. The legislature recognized the need decades ago. The courts recognized the right of the legislature and backed it up in its enactments. The cities, particularly the charter cities, have never ceased in their efforts to prevent two of these departments from coming under the operation of uniform state-wide laws and sovereignty. Those who study cities and those who observe the conduct of the winners in our municipal biennial popularity contests well know this weakness in our system. Our Supreme Court and Appellate Court reports for the last three decades are replete with cases in which cities, particularly charter cities, have sought to question, evade and defeat all of the legislation enacted to bring these two departments under uniform law and state control. The cities and their two-year executives have sought to retain these two departments in the realm of politics, for their own good as distinguished from that of the people.

Probably ninety-five percent of such cases relate to the efforts of elected officials to remove police officers from their jobs; probably five percent relate to similar efforts with reference to firemen. This endless game of political football is not unknown to legislators.

There must have been some cogent reason for much of this wasted effort, for most of it was wasted due to the fact that

our Supreme Court understood it and decided time and again in favor of the proposition that these departments are under state control and jurisdiction because of the state-wide nature of the work and for the better protection of the people. There must also be a cogent reason why attack is made on the police department with such greater frequency than on the fire department. The reason for this is well known to newspaper men, civic students, lawyers, judges, mayors, and legislators.

Civil service rules in all cities prohibit firemen and policemen from political activity in behalf of candidates. Yet for many decades in our own presumably great city, the winning candidates punished those members of both departments who failed to help them in their efforts and rewarded those who did. Such was the standard political practice. Men were thus punished by their civilian superiors for failing to do what they were forbidden to do, all of which legislators know.

It is hardly conceivable that any one could make corrupt money by failing to promptly and efficiently put out a fire. It is easily conceivable that one could make corrupt money by failing to enforce the law. That is the reason for the disproportion in the number of times policemen are attacked by officials as distinguished from firemen. It is well known to legislators and many others that while police should be able to ascertain the existence of commercialized crime, gambling and vice, that such unlawful enterprises, in our great American cities, rarely originate without the advance approval of elected officials who always have the advantage of receiving complaints first, and who then undertake to dictate to the military arm of the city, which is the police department, as to who shall be punished and who shall not. It is no wonder that the legislature and the courts have made an effort for some decades to get this department in particular out of politics. Since there is often corrupt money made in the civilian manipulation of police departments which are constantly under pressure, this effort to keep the police departments in politics perpetually is understandable, and legislators understand it.

These two departments are composed of men who run greater risks than any other public servants except the military under fire. They are paid no more than those who run no risks. No one earns more gratitude from the public or probably receives less for lack of due understanding. They go towards the maniac with the shotgun, or the gas tank about to explode, while all others hasten the other way; the thought of the pension which protects their families may account to some extent for their lack of hesitation, all of which legislators well

know.  Their bravery is shared by health departments, equally unappreciated, equally protected by state law.

It is not so long ago that civil service commissions were very busy all over Ohio reviewing cases of policemen and firemen who were discharged by officials for divers reasons.  Such commissions generally owe their appointments to officials. Such commissions generally sided with the officials which appointed them.  Suddenly all such activities ceased; it is now a rarity. This was accomplished by our legislators who passed a law giving every policeman and fireman a right to appeal his dismissal to the Common Pleas Court by his mere filing of a letter of protest.  When it became a fair fight in open court the officials lost their zest.  This effort of the legislators to operate these departments on a statewide basis, which has been backed by the courts, was one of the most salutary improvements in giving some protection to the men who protect us.

Instances of injustice to the men in these departments committed for political or for worse reasons could be given without number.  The legislature has constantly sought to put them in a position where they will be immune from political attack. It has done a splendid job of protecting them by law in days when we are fast becoming a government of men and not of law.

These are days when men thirst for power, as long as it is at the expense of another; when men swear on a bible to uphold the constitution with one hand while they laugh up their other sleeve; our historic system of checks and balances in three departments of government appears to have lost its application to the executive branch.

The legislators of Ohio have recognized this danger because of the unceasing effort of political executives to prevent the application of state-wide law to the two departments which most protect the people.  The legislature well knew that villages grow up and become cities.  It knew that villages had fire and police departments which constantly cooperate with the departments of contiguous, proximate and surrounding areas in fighting crime or fire.  The legislature knew that if a village blossomed into a city that the new mayors might seize an opportunity to suggest that such change created a vacuum in positions and that mayors, who are but temporary, might discharge police and fire chiefs, whose permanence is a protection to the people because they devote their lives to learning the area, its buildings, the dangers, and how to handle their equipment alone or in conjunction with others. This injustice mayors might readily commit in order to make

their political friends chiefs of police and fire overnight. The legislature must have contemplated that police and fire chiefs built up years of service and experience which should not be so cheaply sacrificed to pay political debts. It contemplated that police chiefs understood traffic, crime, crime prevention, crime detection, and had worked in conjunction with all surrounding police departments. This law is in effect eleven years. During those eleven years villages have constantly blossomed into cities. We find no reported instance of any previous claim of any mayor similar to the contention of this one. We find no recorded instance of any mayor attempting to commit the obvious injustice which this one here threatened to commit and boldly says in his answer he would have already consummated had he not been enjoined.

In 1941 the legislature made all village marshals into chiefs of police. Was their purpose only a change of a title? Or did they contemplate that villages become cities and that the experience of men in such villages might be well utilized by the same population for their protection even though there was a change in legal status due to an increase in population?

Would there be more difference in the duties of the chief of police of Mayfield Heights today as distinguished from what it was last December? In a month would the danger of fire or crime differ? And if it did, who would have better capacity to solve the problem for the benefit of the people,—those who had been fighting the fires and crimes for years, or some political obligee of last year's election?

Defendants say that Section 4372 gives a police chief of a city control of the stationing and transfer of men and that such is greatly different from previous duties of police chiefs in villages as distinguished from cities. Whoever knows about the practical application of this statute knows how ridiculous this contention is, even in the large cities. Will there be any more stationing and transferring of the handful of men in Mayfield Heights necessary today than last year? How many different stations are there to which they might be transferred? Who stationed them heretofore? Is this not a distinction without a difference? When §4384 GC relates that the marshal is chief of police did not the legislature know what the head of a police department does? When it relates that such police chief continues in office until removed as provided by §§4263-4267 GC, didn't the legislators know that villages blossomed into cities? Had they intended that the office of police chief of a village became voided and vacant and nonexistent because villages become cities, would they

not have said so, in view of their knowledge of the struggle which has been going on for decades to prevent police departments from coming under that state control which the legislature intended, and which our highest court has repeatedly approved?

We hold from the language here used that the legislature meant what it said; that it contemplated full well that villages become cities and that it was their intention that the chief of police of the village continue in his office, with his work, his duties, his responsibilities, irrespective of the change in the name and status of the political subdivision because by so doing the people would be better protected and the continuity of protection would be ensured. Obviously, the legislature contemplated that police and fire chiefs of years of experience in villages would know at least as much about the protection of the people as would any newly-born chief whose qualifications consisted of political friendship for the winner in the last election. Mayors come and go; they are expected to be temporary. The legislature enacted a system of state-wide pensions for police and firemen because we had hoped they would not be temporary.

Our legislature set up a pension and retirement system for police and firemen which is also state-wide in its application. Formerly, such rights were entirely subject to the whim and caprice of every mayor and city council in Ohio; there were as many different systems as there were mayors. Many municipalities fought the state-wide pension system; some cities refused to initiate one; some sought to abandon it after it existed; some sought to destroy departments to avoid it. Nevertheless, the statutes, as construed by the courts, prevailed, and the state-wide system of police and fire protection now gives its protectors such state-wide pension protection. But the cities gave our Supreme Court a busy decade after that particular enactment.

This particular plaintiff has an investment of approximately fifteen years of his time, effort, and personal risk in this department. Defendant mayor would destroy all of his rights in their entirety overnight. In his brief he intimates that plaintiff really has no rights since it would take ten more years of service for him to collect full pension. Defendant mayor would lightly dismiss the past fifteen years of service of this plaintiff which elapsed before such mayor arrived on the scene. Certainly the legislature never intended that this plaintiff or any police chief would be so defrauded of such investment which he made in himself for the ultimate benefit of the people. It did not intend that he be thus cheated

because a village grew up. It did not intend that because more people lived within certain boundaries than formerly that the fifteen year experience of this chief should be destroyed to the detirment of the people. If the theory of this defendant mayor should here prevail, then there would be offered by law, to all future winners in election contests, the inducement and opportunity of making their political friends into police and fire chiefs over-night on the theory that vacuums were created because of change in status. Our legislature never intended to invite any such political orgy of decapitations of its experienced, competent and loyal safety chiefs, just to give new mayors a chance to pay off.

It is not mere coincidence that defendants here have no precedent for their claims; in general, the people of Ohio have learned that these departments are in an especially protected class by themselves, not for their own sake, but for ours; our people have learned that the legislature intended them to come under state-wide control, sovereignty, and protection, and the decent law-abiding people of Ohio have come to respect the class, the condition, and the law which protects them to protect us. The legislature never intended any vacancy or vacuum in the office of chief of police merely because populations increased; it really abolished the very title of marshal and set up a police chief to head its every police force in contemplation that as the village became a city the chief would continue in office until removed for statutory causes for removal, and it very plainly said so. It could not have intended to cause certain chaos, confusion and political preferment in the maturing of every village, at the expense of their noblest and bravest public servants who would thus become victimized for having been loyal, whose investment in themselves would thus become destroyed, whose wives and children would have become robbed of their pension rights, all, just to make way for incompetent successors at the selection of men whose very competency would have been disproved by such selection. No Ohio legislature ever intended that. None better understand the danger than the Ohio legislators. Our legislature condones no form of cheating; by this enactment it seeks to prevent it, as does this court, though we all appreciate such efforts will never cease for reasons heretofore set forth.

Much has been said of Mayor Defendant's authority to discharge plaintiff under Article III, Section D, of the new city charter. We cannot agree with the strained construction defendants would have us put on the language involved but irrespective of whether or not the language in question under-

takes to give this mayor power to discharge this police chief instantly on his entering office, the fact nevertheless remains that the statutory enactment of our legislature must be complied with and there is but one way to remove this police chief from office and that is in strict accordance with the statute itself. Of course, the provisions of the charter cannot negative state law, and the framers of the charter so recognized when they made it subject to "the laws of Ohio."

Of course, these defendants were not involved in any of the past controversies or history which has here been mentioned; it is merely set forth as explanatory of what the legislature knew, what they sought to avoid and the means of prevention they utilized in the formulation of the law.

Does the legislature have the right to enact a statute carrying over the office of chief of police of a village to that of chief of police of a city subject only to removal under state law? To make the issue crystal clear, this court holds that the legislature does have such power and has properly exercised it herein. Police, fire and health protection are within the sovereign power of the state and cities and villages are but arms or agencies of our sovereign State of Ohio. The state may even withdraw powers which it has already granted in this respect. The state may impose duties and responsibilities on municipalities as its arms or agencies. It may require that policemen can be suspended only in conformity with state law and not in conformity with a differing city charter. It may require the cities to use certain platoon systems in the fire departments and to give firemen twenty four hours off duty after twenty four hours on; it may require the cities to provide the necessary funds to maintain the fire department under such conditions. The legislature may decrease, change, regulate, or take back powers which it has already given to municipalities.

When the legislature permits a municipality to become part of its sovereign arm, the municipality becomes immune from liability because it partakes of the nature of sovereignty and has become a governmental agency.

Basically, police, fire and health protection are the responsibility of the state even though such departments may appear physically in their origins to have been municipal ventures, but the fundamental responsibility is that of the state, and it may properly prescribe the manner in which the people are to be protected when villages emerge into cities.

When the village emerges into a city the change is physically difficult to perceive. Only the census taker can prove it. Fire, police and health work goes right on as if the change

had never taken place. The state has a special interest in insuring that it will.

Villages, cities, or their mayors have no special property rights in these branches of state sovereignty of which the municipality becomes an arm or part. All police departments of all villages and cities are but branches of state sovereignty which derive their primary responsibility from the state for the purpose of enforcing state law. The Constitution which guarantees life, liberty and property requires the state to defend such rights and the agency of the state for that purpose is the police departments of the municipalities throughout the state, although the responsibility of the state does not end at city limits. We quote from the cited case of **Cincinnati v. Gamble, 138 Oh St** at **page 231, 20 O. O. 278,** as follows:

"Control of deadly, contagious diseases may often require uniform state action; prevention of fire may be ineffective without unified effort reaching into urban, suburban and rural sections; and the policing of the state might well be inadequate to public need if done by a state constabulary with power to act only in areas outside municipalities. The state must remain sovereign in all such affairs else its authorities cannot protect rights assured to its citizens by its Constitution. These are fundamental reasons why police, fire and health undertakings are essentially attributes of state sovereignty and matters of state-wide concern."

When the legislature lends part of its sovereignty to its agent, whether it be village or city, it retains the power to decide how the village or city will carry out the function of preserving peace and protecting people and property. See **State, ex rel v. Houston, 138 Oh St 203, 20 O. O. 265, syllabus 2:**

"Power is granted to municipal corporations to legislate in the interest of public peace and the protection of persons and property within their territorial limits, but such legislation must not conflict with state legislation on the same subject, and there is reserved to the Legislature power to direct the manner and method by which municipal corporations shall effectively carry out their functions having to do with the preservation of the peace and the protection of persons and property."

We hold that a statute carrying over the office of chief of police of a village to that of chief of police of a city which evolved from that village comes within the power of the legislature to decide just how peace will be best preserved and life and property best protected. If any better method will ever be devised than the one the legislature so selected, that

method must of necessity also emanate from our legislature in order that state sovereignty be uniformly exercised.

Our Supreme Court has very well explained this proposition with respect to fire departments, which explanation applies with equal cogency to police and health departments as appears in the following excerpts from the same case:

**138 Oh St, 211, 20 O. O. 269:**

"It is a matter of general knowledge that the ownership of property in a municipality is not wholly confined to its inhabitants but some of it is owned by nonresidents; that the ownership of shares in corporations owning the large business and manufacturing properties of the cities are widely held; that large numbers of people residing outside the municipalities are constantly going within their boundaries, entering places of business and places of abode, and being exposed to the hazards of disastrous fires; and that through the growth of urban populations, the boundary lines of separate corporations are often coincidental with each other with the result that the residents of one municipality are constantly exposed to fire hazards of contiguous municipalities. The protection of life and property from the hazards of fire, conserves the private as well as the public resources of the country and consequently is a matter of public welfare and concern:

**138 Oh St, 212, 20 O. O. 269:**

"Likewise, adequate fire protection calls for the employment of great numbers of men who are obliged to live under modes of life and conditions of employment which take them away from their homes for longer intervals of time than most employments, and which expose them to unusual dangers of life and limb. Likewise, the health of such employees is constantly placed in jeopardy by the incidents of their employment. These are considerations which call for the exercise of the police power in the interest of the public and the state. The Legislature is given large discretion in determining the measures which are necessary or appropriate to secure the public welfare. Statutes to promote such purposes are upheld, if possible, and it is only when the Legislature clearly transcends its powers that such statutes are stricken down."

**138 Oh St, 214, 20 O. O. 270:**

"When the policy of the state of Ohio relating to fire protection and to the welfare of firemen, as expressed in state legislation and in court decisions, is taken into consideration, the validity of the statute in question must be sustained. The state, through legislative enactment, has established a statewide fire protective policy in providing an exhaustive state building code, to protect against fire hazards; and a depart-

ment of workshops and factories to inspect buildings and eliminate fire hazards by ordering alterations and preventing the use of buildings until compliance with lawful orders for alterations. The state has established a tenure subject to removal for cause for the members of the fire departments of villages of the state (§4389 GC), and a civil service status for firemen in cities (§§4378, 4380 GC), and a state-wide system of firemen's pensions, all of which are considered matters of state-wide concern and subject to state legislation. **Thompson v. City of Marion, 134 Oh St, 122, 11 O. O. 549, 16 N. E. (2d), 208.**"

Defendants' authority, the Serp case, has no application to the office of police chief which came under the special protection of our legislature through the statutory enactment which became effective nine years after the rendition of such decision.

We direct counsel to furnish journal entry of declaratory judgment to the following effects:

1. A finding that Defendant Mayor, has no power to reduce or remove plaintiff from his office of Chief of Police of the city of Mayfield Heights under Article III, Section D of its charter;

2. A finding that plaintiff is now Chief of Police of Mayfield Heights;

3. A finding that plaintiff's tenure is subject to the laws of Ohio mentioned and to state-wide jurisdiction.

The court will not grant declaratory judgment as requested by plaintiff to the effect that he can not be charged with acts which may be claimed to have occurred prior to January 1st, 1952. Charges may be brought, in conformity with the law, subject to ultimate review of the Court of Common Pleas, at any time, against any police chief in this state. There can be no legal objection to the fair trial of any police chief at any time on any charges properly brought. There can never be objection to proper legal attack, all of which is subject to ultimate review by this court. There is objection to the within attempted attack, disgrace, loss of personal and property rights, all without charge, trial, or any pretense of plaintiff's chance to appeal to the court. If plaintiff or any one else is to lose any rights let him lose them in accordance with the laws of Ohio and not merely in accordance with the whim or caprice of any self-styled "strong mayor" who promises his head in advance.

Our cities should not begrudge the legislature that retention of power over these three departments which our Supreme Court has repeatedly stated comes within the legislature's

duty of preserving peace and protecting persons and property. Nor should executives exhibit unwillingness to abide by court decisions which approve such proper enactments of our legislature in the performance of its responsibilities.

If this is a government of laws and not of men then all three departments must operate under our American system of checks and balances.

Counsel are directed to so prepare such journal entry or such declaratory judgment re issues involved.